IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2015


## CHRISTOPHER M. BLACK v. STATE OF TENNESSEE

Appeal from the Criminal Court for Davidson County
No. 2004-A-246    Monte Watkins, Judge

_____

No. M2014-01607-CCA-R3-PC – Filed December 29, 2015
_____


In 2006, the Petitioner, Christopher M. Black, was convicted by a Davidson County jury of two counts of aggravated rape and two counts of aggravated robbery, for which the Petitioner received an effective sentence of fifty years in the Department of Correction. On direct appeal, this court affirmed the Petitioner's convictions and sentence. Thereafter, the Petitioner filed a petition for post-conviction relief, which was denied following a hearing. On appeal from the denial of post-conviction relief, the Petitioner contends that he received ineffective assistance of counsel based upon trial counsel's failure to hire a DNA expert to analyze the evidence against the Petitioner. Following our review, we affirmed the judgment of the post-conviction court. Thereafter, the Tennessee Supreme Court granted the Petitioner's application for permission to appeal and remanded the matter to the post-conviction court for the entry of a supplemental order denying the petition. The post-conviction court complied with the remand order and filed a supplemental order with this court. Upon reconsideration of the Petitioner's case, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, Christopher M. Black.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. Johnson, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

On February 6, 2004, the Petitioner was indicted on two counts of aggravated rape, a Class A felony, and two counts of aggravated robbery, a Class B felony. Following a jury trial, the Petitioner was convicted as charged. For each aggravated rape conviction, the Petitioner received a twenty-year sentence to be served consecutively to one another. For each aggravated robbery conviction, the Petitioner received a ten-year sentence to be served concurrently with one another but consecutively to the aggravated rape convictions, for an effective fifty-year sentence. The facts underlying the Petitioner's convictions, as summarized by this court on direct appeal, are as follows:

> . . . This case stems from a brutal attack upon a female victim, L.P., and a male victim, D.B., beginning in the late hours of February 12, 1999, and ending in the early morning hours of February 13, 1999. The victims had been friends for several years. Around 11:30 p.m. on the night of the offense, the female victim drove to the male victim's parent's home where the male victim lived to borrow a movie. She pulled her vehicle in front of his home and paged him to come outside. The male victim came outside, gave her the movie, and sat inside her vehicle to talk. About fifteen minutes later, the male victim was getting out of the vehicle when he and the victim saw two men with hoods coming through his yard.

> The female victim stated that the two men came around from behind her vehicle, over to the driver's side, and knocked on the window. Neither victim knew the two men. The female victim cracked the window, and a revolver was stuck in the window to her temple. The men screamed at the female victim, "Get out of the car, [b****]. Get out of the car [b****]." The vehicle was still running, and she unlocked the door and opened it. The female victim said that a chrome revolver was put to her head. She stated, "[I]t looked like it had a pearl, or like, an engraved handle. Looked more like a collector's gun."

> When the female victim began to get out of the vehicle, the men pushed her back inside. At this point, she stated that she was in the front seat of her vehicle. The male victim had gotten out of the vehicle and was on the ground. The men went through the vehicle and told the victim they wanted her wallet and money. She told them that she only had ten dollars, and they yelled at her for not having more money. The men looked through the trunk twice and took the female victim's credit cards.

The female victim differentiated between the two men by their skin tone. After the men asked for the female victim's money, the female victim stated that the man with the dark complexion demanded that she perform oral sex on him. She testified that he said, "'[Y]ou're going to suck my d***.'" She said that she complied because she had a gun to her head and was terrified. She stated, "It started in the street. He made me get on my knees in the street and perform oral sex. And they both switched back and forth between four to six times." Both men forced her to perform oral sex against her will and consent by threatening her with a weapon.

The female victim testified that after the men forced her to perform fellatio on them, the man with the lighter complexion said, "'I want to f*** this b****.' And they made [her] pull down [her] pants and bend over in the street. And they took turns raping [her] from behind." When one man was raping her, the other was watching for oncoming cars. After being vaginally raped, the female victim was forced back inside the car to perform oral sex. Initially, the female victim could not recall if either man ejaculated. However, she later stated that, at some point, one of the men ejaculated in her mouth. She could not recall where she was physically positioned but she gagged, and spit the ejaculate outside the vehicle on the pavement of the street.

The female victim recalled that the male victim begged the men to stop. The men began to leave, but came back. They ordered the male victim to run down the street while they held the female victim by her hair at gunpoint. The men then pushed the female victim, and told her to run and not to look back. The female victim found the male victim, and they ran down the street knocking on doors until someone gave them a phone to call 911. The male victim's father came to pick them up and later took them to the crime scene to wait on the police. When the female victim returned to the scene, her vehicle was still there with the four doors open.

At trial, the female victim identified photographs from the crime scene. She specifically identified a photograph of the ejaculate that she spit out onto the pavement. It was admitted into evidence as collective exhibit 1G. She recalled that the police officers marked exhibit 1G as significant. She described both men as in their early twenties. She also estimated that the attack lasted around thirty to forty-five minutes. She stated that the men were dressed alike. They wore masks, black jeans and sweatshirts, but one man had on a red shirt and the other a blue shirt. The man with the blue shirt had a dark complexion and the man with the red shirt had a light complexion.

The female victim was not missing any of her credit cards, but the men took her ten dollars. She told the police what happened and was given a gynecological examination that night. The police obtained internal vaginal swabs and swabs of her mouth. A black light was placed over her naked body to determine the existence of any pubic hairs or semen. The police also took the female victim's clothes. The female victim stated that she did not discuss what she was going to tell the police with the male victim.

The female victim recalled that, at some point, the two men took their masks off. However, she could only remember seeing the lighter complected man's face. She and the male victim provided the police with a sketch; however, she had no input in the sketch developed by the male victim. She stated that she did not remember anything about the man with the dark complexion.

On cross-examination, the female victim acknowledged that she had trouble remembering the sequence of events; specifically, whether she was forced to perform oral sex or was vaginally raped first. In regard to the events leading up to the man's ejaculating in her mouth, she said she could not remember whether both men or only one man forced her to perform oral sex. She further conceded that she was unsure if the man with the lighter complexion ejaculated in her mouth. She also admitted that she had previously misidentified a busboy that she saw at a restaurant from a photographic lineup as the man with the lighter complexion. This photographic lineup was admitted into evidence as exhibit 8.

The female victim explained that the attack occurred in a residential neighborhood and that the area was illuminated by the headlights on her vehicle and by various streetlights. She recalled that the inside of the vehicle was illuminated from the dash board. She explained that the men wore masks when they pistol-whipped [the male victim] but took them off during the rape. She had no memory of either man wearing gloves but stated that both men held her credit cards in their hands.

The male victim testified and corroborated the female victim's testimony. He explained that when he went outside to meet her that night, everyone else inside his house was asleep. He stated that the men took his coat, which contained his wallet and $350. He also had a "stereo face" inside his coat pocket. The two men also took his earrings, skull cap, and tennis shoes. He noticed that the men had a silver weapon, and he saw one of the men forcing the [female] victim to perform oral sex on him.

The male victim also distinguished the men by skin tone and said that the man with the dark complexion had the gun. He saw the darker complected man, whom he later identified as [the Petitioner], forcing the [female] victim to perform oral sex on him. The male victim confirmed that the man with the dark complexion also hit him in the back of the head with the gun. He went to the hospital and received nine stitches to the head and had a scar as a result. He provided a statement to the police and worked on a sketch that same day. The male victim said that he worked on the sketch which was admitted into evidence as exhibit 2-A. When the sketches in this case were developed, the male victim and the female victim were not in the same room.

The male victim identified [the Petitioner] as the person he saw forcing the female victim to perform oral sex on him from a photographic lineup, which was admitted into evidence as exhibit 4. The male victim testified that it was "the eyes" that stood out to him. He said that the man was younger than he, 5'10" tall and 130 pounds. He admitted that he had previously been confused about whether [the Petitioner] wore a red shirt or a blue shirt but said he was certain of his identification.

On cross-examination, the male victim stated that his credit card was used at a gas station and two other stores within thirty minutes of the offense. He conceded that in two prior photographic lineups, he identified another individual as someone who "looked like" the dark complected man. He clarified that in each of those lineups, he told Detective Sutherland that he "wasn't one hundred percent sure" or was "not positive" of the identification. Four years after the initial photographic lineups, the male victim was brought in to view another photographic lineup. Detective Sutherland told him he had a possible suspect and that there was a DNA match. The male victim testified that when he identified [the Petitioner] from the photographic lineup, Detective Sutherland told him that he had chosen the person confirmed by DNA analysis.

The male victim's sister testified that she was at home on the night of the offense. She heard noises outside and heard someone say "Make those 'hos run." She woke her father, went outside, and noticed the female victim's vehicle in front with the doors open and things on top of the roof. There was no one around at the time. She called the non-emergency number, and she and her father closed the doors to the vehicle. She later received a call from a neighbor indicating the female victim and her brother

-5-

were there and had been hurt. She went inside to upgrade her previous non-emergency call to a 911 call.

State v. Christopher M. Black, No. M2007-00970-CCA-R3-CD, 2010 WL 8500217, at *1-4 (Tenn. Crim. App. Feb. 26, 2010), perm. to app. denied (Tenn. Aug. 26, 2010). During the subsequent investigation, a sample of bodily fluid was collected from the crime scene and an "unknown male [DNA] profile" was created. When the unknown male profile was run through the "CODIS" database, investigators received a "CODIS hit" matching the unknown male profile to the Petitioner. Based upon this hit, a search warrant was issued for a sample of the Petitioner's blood. A DNA profile base was developed from the Petitioner's blood sample, and testing revealed that the Petitioner's "matched" an evidence swab collected from the victim's rape kit which contained semen. The male victim also identified the Petitioner in a photo lineup. Id. at *4-9. Upon review, this court affirmed the Petitioner's convictions but remanded for a resentencing hearing "regarding [the Petitioner's] sentencing status with respect [to] the 2005 sentencing act and regarding the issue of consecutive sentencing." Id. at *1.

Following a hearing on remand, the trial court sentenced the Petitioner to twenty-five years for each count of aggravated rape and to ten years for each count of aggravated robbery. The court ordered that the two aggravated rapes be served consecutively but concurrently to the sentences for robbery, again resulting in an effective sentence of fifty years. On appeal, this court affirmed the trial court's sentences as imposed. State v. Christopher M. Black, M2010-02176-CCA-R3-CD, 2011 WL 7562957, at *1 (Tenn. Crim. App. Dec. 13, 2011), perm. to app. denied (Tenn. May 16, 2012).

On October 18, 2012, the Petitioner timely filed for post-conviction relief alleging ineffective assistance of counsel. Counsel was appointed to the Petitioner, and a new petition for post-conviction relief was filed September 4, 2013. At a hearing conducted June 25, 2014, the Petitioner testified that he had three jury trials in his case: the first resulted in a mistrial, the second resulted in a hung jury, and the third resulted in his convictions for aggravated rape and aggravated robbery. Trial counsel represented the Petitioner in each of the trials and in his two appeals. The Petitioner testified that he believed trial counsel had been prepared for trial.

Trial counsel talked to the Petitioner about the evidence against him and about the defense strategy. The Petitioner testified that the State's DNA evidence was a key part of the case against him but he was unsure of how trial counsel intended to defend against it. He explained, "I mean, I have no doubt they had DNA evidence against me, but I didn't know what the defense was going to be to defend against the DNA evidence." The Petitioner did not recall speaking to trial counsel about his response to the DNA evidence other than that trial counsel intended to cross-examine the State's DNA expert.

-6-

The Petitioner testified that trial counsel did not discuss the possibility of hiring a DNA expert for the defense. Moreover, the Petitioner was unaware that trial counsel could request funds to hire such an expert. The Petitioner testified that, had he known funds were available, he would have insisted on a DNA expert of his own. The Petitioner acknowledged, however, that trial counsel attacked the DNA evidence during each of his trials by attacking the chain of evidence. Trial counsel also attacked the eyewitness testimony concerning the identification of the Petitioner and vigorously cross-examined the officers in charge of the investigation. He further acknowledged that several of the issues raised by trial counsel on direct appeal related to the DNA evidence. The Petitioner did not call a DNA expert to testify on his behalf at the post-conviction hearing.

At the conclusion of the hearing, the post-conviction court entered a written order denying relief, and the Petitioner filed a timely notice of appeal.

On March 19, 2015, following briefing by the parties, this court issued an opinion affirming the post-conviction court's denial of relief. See generally Christopher M. Black v. State, No. M2014-01607-CCA-R3-PC, 2015 WL 1285713 (Tenn. Crim. App. Mar. 19, 2015), perm. app. granted (Tenn. Aug. 21, 2015). Thereafter, counsel for the Petitioner withdrew from the case, and the Petitioner filed a pro se application for permission to appeal. On August 21, 2015, the Tennessee Supreme Court entered an order granting the Petitioner's application and remanding the matter to the trial court for entry of a corrected order denying the petition for post-conviction relief. The Court explained that the original order entered by the post-conviction court did not accurately reflect what occurred at the hearing on the petition.

The post-conviction court filed a supplemental order denying post-conviction relief on September 16, 2015. In the supplemental order, the post-conviction court outlined the facts presented at the post-conviction hearing and concluded that the Petitioner had failed to establish that trial counsel was ineffective. Specifically, the court found that the Petitioner had failed to present a DNA expert at the post-conviction hearing to support his claim that counsel was ineffective for failing to present such an expert at trial. Following the transmittal of the post-conviction court's supplemental order to this court, we allowed the parties time for additional briefing. The Petitioner did not file a supplemental brief, but the State chose to do so. We will now reconsider this matter based upon the record, parties' briefs, and the supplemental order from the post-conviction court.

## II. Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828,

830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Id.; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

The Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to seek indigent funds and secure a DNA expert for the defense. In denying relief, the post-conviction court found that the Petitioner had failed to present a DNA expert at the post-conviction hearing and had failed to show how the outcome of his trial would have been different had a DNA expert been presented by the defense. The record supports the post-conviction court's findings.

As we have repeatedly cautioned, a post-conviction petitioner cannot succeed on a claim that "counsel was deficient [for failing to call] a known witness" unless the petitioner "produce[s] a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which enured to the prejudice of the petitioner." Id. at 757. Neither the post-conviction court nor this court can speculate or guess what a DNA expert's testimony might have been if introduced at trial. See id. Absent the presentation of an expert at the post-conviction hearing who would have provided relevant evidence, the Petitioner cannot show deficiency or prejudice.

Because the Petitioner has failed to demonstrate what expert testimony could have been presented at trial or how he was prejudiced by the absence of that testimony, we conclude that the post-conviction court properly denied relief.

## III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE